Filed 5/3/12 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2012 ND 86

Ashley Vining, Plaintiff and Appellant

v.

Michael Renton, Defendant and Appellee

No. 20110233

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable Sonna M. Anderson, Judge.

AFFIRMED.

Opinion of the Court by Crothers, Justice.

James R. Brothers (argued), 500 Second Avenue North, Suite 400, P.O. Box 1680, Fargo, ND 58107-1680, for plaintiff and appellant.

Stacy Mae Moldenhauer (argued) and Suzanne Marie Schweigert (appeared) 122 East Broadway Avenue, P.O. Box 460, Bismarck, ND 58502-0460, for defendant and appellee.

Vining v. Renton

No. 20110233

Crothers, Justice.

[¶1] Ashley Vining appeals a district court amended judgment granting Michael Renton’s motion to modify primary residential responsibility for their child.  Vining argues the district court’s decision was clearly erroneous.  We affirm.

I

[¶2] Vining and Renton are the parents of a 4-year-old child.  They never married and have not lived together since the child was born.  On April 24, 2008, Vining and Renton filed with the district court a stipulated child custody agreement giving Vining primary residential responsibility subject to Renton’s right to exercise parenting time as agreed to by the parties.  The agreement provided Renton’s parenting time would be supervised by Vining with no overnight parenting time unless the parties otherwise agreed.  When the agreement was filed, both Vining and Renton resided in Bismarck, North Dakota.  On April 29, 2008, the district court entered a judgment incorporating the stipulated agreement.

[¶3] In May 2009, Vining met Matthew Corcione while vacationing in Las Vegas.  After returning to North Dakota, Vining began dating Corcione, who lived in Georgia.  During the summer of 2009, Corcione made a number of trips to North Dakota to visit Vining and the child.  Vining also visited Corcione in Georgia, making some trips with the child and others without the child.  Vining and Corcione became engaged in October 2009, and Vining started planning to move to Georgia.

[¶4] In January 2010, without informing Renton, Vining took the child to Georgia for several weeks.  During that time, Vining and Corcione planned a June wedding, looked at houses and decided Vining and the child would move to Georgia before Vining and Corcione were married.  While the child was in Georgia, Vining allowed Renton periodic phone contact with the child but would not tell Renton when she planned to return the child to North Dakota.

[¶5] Vining and the child returned to North Dakota in February 2010.  While in North Dakota, Vining allowed Renton to visit the child.  On March 2, 2010, Vining left North Dakota with the child, intending to move to Georgia to live with Corcione.  Vining did not obtain a court order or receive Renton’s consent to relocate the child.  After leaving North Dakota, Vining notified Renton of the move by leaving a message on his cell phone.  When Renton received the message, he contacted Vining and requested she return the child to North Dakota.  Vining refused to return the child and refused to give Renton her Georgia address.

[¶6] On March 19, 2010, Renton moved the district court to find Vining in contempt for moving the child to another state without permission and for refusing to give Renton the child’s current address.  That same day, the district court ordered Vining to appear with the child on April 8, 2010, to show cause why she should not be held in contempt.  After Vining received the show cause order, Vining and Corcione accelerated their wedding date and were married on April 1, 2010.  On April 8, 2010, Vining and the child appeared at the show cause hearing in North Dakota.  On April 30, 2010, the district court found Vining in contempt.  The district court prohibited Vining from leaving North Dakota with the child more than once per month for no more than five days at a time and ordered Vining and Renton to arrange a parenting schedule, stating Renton was entitled to substantial parenting time, including overnights.

[¶7] On April 26, 2010, Vining, who lived with her parents in Jamestown, North Dakota, moved for permission to relocate the child to Georgia.  On May 7, 2010, Renton resisted Vining’s motion to relocate the child and moved to modify the April 29, 2008 judgment incorporating the stipulated parenting plan.  Renton argued the district court should grant him primary residential responsibility and grant parenting time to Vining.  Renton stated he currently lived in Fessenden, North Dakota where he was employed as a deputy sheriff and he hoped to get a job with the Bismarck Police Department and move to Bismarck.  Renton also requested that the court establish a parenting schedule because he and Vining had been unable to reach an agreement.  On May 27, 2010, the district court issued an interim order for parenting time.

[¶8] On September 14, 2010, the district court held a hearing on Vining’s motion for permission to relocate the child and on Renton’s motion to modify primary residential responsibility.  On October 5, 2010, Vining moved to withdraw her motion to relocate the child, stating she no longer intended to leave North Dakota but providing no explanation for the change.  The interim order for parenting time expired at the end of 2010.  On January 7, 2011, the parties informed the district court they could not agree on a continued parenting schedule and submitted proposed parenting schedules.  On January 21, 2011, Renton requested the district court adopt a parenting schedule because Vining was not allowing him to exercise parenting time.  On January 28, 2011, the district court issued an order implementing Renton’s proposed parenting schedule.

[¶9] On February 28, 2011, the district court ordered Vining and Renton to submit affidavits addressing Vining’s changes in address, employment and marital status.  On March 11, 2011, Vining and Renton filed affidavits.  Vining stated she lived in Bismarck, was employed full-time as a data specialist at Medcenter One and was no longer married.  Vining also stated Renton had introduced the child to his girlfriend and Renton and his girlfriend had purchased a house.  Renton agreed with Vining’s assertions that she lived in Bismarck and was no longer married but stated he believed Vining had been terminated from Medcenter One.  Renton also stated he was employed by the Wells County Sheriff’s Office, had applied to be transferred to Bismarck and had purchased a house in Lincoln, North Dakota.  On March 18, 2011, Renton and Vining filed response affidavits.  Renton stated he was certain Vining was terminated from Medcenter One and believed Vining may be living in Jamestown.  Renton included a letter from Medcenter One stating Vining was terminated on February 10, 2011.  Vining stated she lived in Bismarck, had opened a daycare in her home and worked on-call for Medcenter One.  Regarding Vining’s employment at Medcenter One, her affidavit stated:

“I have not been terminated from Medcenter and have no idea why [Renton] would say such a thing.  I should have more carefully read my last affidavit.  I did not see that my attorney had included hours I worked for Medcenter.  Those hours are no longer accurate since I am only working on-call when I don’t have [the child].”

[¶10] On April 7, 2011, the district court held a hearing to address the affidavits.  At the hearing, Vining testified she believed she was on-call for Medcenter One at the time her affidavits were filed and did not know she had been terminated until Renton produced the letter from Medcenter One.  Medcenter One’s director of business services contradicted Vining’s testimony, testifying she believed Vining knew she was terminated.  The director testified Vining signed a document stating she was terminated.  The director further testified Vining attempted to contest her termination and was told by the director that she was ineligible for rehire.

[¶11] On April 18, 2011, the district court issued a memorandum opinion and order for amended judgment granting Vining’s motion to withdraw her motion for permission to relocate and granting Renton’s motion to modify primary residential  responsibility.  On June 13, 2011, the district court entered an amended judgment giving Renton primary residential responsibility and incorporating Renton’s proposed parenting plan.

II

[¶12] Vining argues the district court’s decision to change primary residential responsibility from Vining to Renton was clearly erroneous.  Renton responds the decision was supported by evidence in the record and was in accordance with the law.

[¶13] Section 14-09-06.6(6), N.D.C.C., governing modification of a primary residential responsibility order after two years from the date of entry, provides:

“6. The court may modify the primary residential responsibility after the two-year period following the date of entry of an order establishing primary residential responsibility if the court finds:

“a. On the basis of facts that have arisen since the prior order or which were unknown to the court at the time of the prior order, a material change has occurred in the circumstances of the child or the parties; and

“b. The modification is necessary to serve the best interest of the child.”

Recognizing that N.D.C.C. § 14-09-06.6 essentially codified the two-step approach developed in our case law, we have continued to rely on our prior cases to the extent that those cases are consistent with the statute.  
Hill v. Weber
, 1999 ND 74, ¶ 9, 592 N.W.2d 585.  “Where the provisions of the statute differ from previous case law, the statute prevails.”  
Id.
 (citing N.D.C.C. § 1-01-06).

[¶14] Section 14-09-06.6, N.D.C.C., requires that the district court use a two-part analysis to determine whether to modify primary residential responsibility.  First, the district court “must consider whether there has been a material change of circumstances since the original custody decree.”  
Kelly v. Kelly
, 2002 ND 37, ¶ 15, 640 N.W.2d 38 (citing N.D.C.C. § 14-09-06.6(6)(a)).  Second, if there has been a material change, the district court “must decide whether a change in custody is necessary to serve the best interests of the child.”  
Kelly
, at ¶ 15 (citing N.D.C.C. § 14-09-06.6(6)(b)).  The party seeking modification has the burden of proving a change is necessary.  N.D.C.C. § 14-09-06.6(8).

[¶15] A district court’s decision to modify primary residential responsibility “is a finding of fact subject to the clearly erroneous standard of review.”  
Kelly
, 2002 ND 37, ¶ 13, 640 N.W.2d 38.  “A finding of fact is clearly erroneous if there is no evidence to support it, if the finding is induced by an erroneous view of the law, or if the reviewing court is left with a definite and firm conviction a mistake has been made.”  
Id.
 (citing N.D.R.Civ.P. 52(a)).

[¶16] Vining does not challenge the district court’s finding of a material change in circumstances.  Vining argues the district court’s finding that modification was necessary to serve the best interest of the child was based on an erroneous view of the law because the district court weighed the best interests factors under the standard for an initial primary residential responsibility determination rather than under the standard for modification of primary residential responsibility.

[¶17] To determine whether modifying primary residential responsibility is necessary to serve the best interests of the child, the district court must consider the applicable N.D.C.C. § 14-09-06.2(1) factors.  
Kelly
, 2002 ND 37, ¶ 22, 640 N.W.2d 38.  Section 14-09-06.2(1), N.D.C.C., provides:

“1. For the purpose of parental rights and responsibilities, the best interests and welfare of the child is determined by the court’s consideration and evaluation of all factors affecting the best interests and welfare of the child.  These factors include all of the following when applicable:

“a. The love, affection, and other emotional ties existing between the parents and child and the ability of each parent to provide the child with nurture, love, affection, and guidance.

“b. The ability of each parent to assure that the child receives adequate food, clothing, shelter, medical care, and a safe environment.

“c. The child’s developmental needs and the ability of each parent to meet those needs, both in the present and in the future.

“d. The sufficiency and stability of each parent’s home environment, the impact of extended family, the length of time the child has lived in each parent’s home, and the desirability of maintaining continuity in the child’s home and community.

“e. The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.

“f. The moral fitness of the parents, as that fitness impacts the child.

“g. The mental and physical health of the parents, as that health impacts the child.

“h. The home, school, and community records of the child and the potential effect of any change.

“i. If the court finds by clear and convincing evidence that a child is of sufficient maturity to make a sound judgment, the court may give substantial weight to the preference of the mature child.  The court also shall give due consideration to other factors that may have affected the child’s preference, including whether the child’s preference was based on undesirable or improper influences.

“j. Evidence of domestic violence. . . .

“k. The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household of a parent and who may significantly affect the child’s best interests.  The court shall consider that person’s history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault, on other persons.

“l. The making of false allegations not made in good faith, by one parent against the other, of harm to a child as defined in section 50-

25.1-02.

“m. Any other factors considered by the court to be relevant to a particular parental rights and responsibilities dispute.”

In a proceeding to modify primary residential responsibility, the district court must analyze the best interests factors in light of two considerations not required in an original primary residential responsibility decision:

“First, the best interests of the child factors must be gauged against the backdrop of the stability of the child’s relationship with the custodial parent, because that stability is the primary concern in a change of custody proceeding.  Second, after balancing the child’s best interests and stability with the custodial parent, the trial court must conclude that a change in the status quo is required.  A child is presumed to be better off with the custodial parent, and close calls should be resolved in favor of continuing custody.  A change should only be made when the reasons for transferring custody substantially outweigh the child’s stability with the custodial parent.” 

Myers v. Myers
, 1999 ND 194, ¶ 10, 601 N.W.2d 264 (citations, quotations and emphasis omitted).

[¶18] Vining argues the district court failed to weigh the best interests factors against the backdrop of the stability of the child’s relationship with Vining.  Renton responds the district court properly considered the child’s relationship with Vining and the fact that Vining had primary residential responsibility for the child since birth.

[¶19] The district court addressed each of the N.D.C.C. § 14-09-06.2(1) best interests factors in its order, finding factors (d), (e) and (f) favored Renton; factors (a), (b), (c) and (k) were equal and factors (g), (h), (i), (j) and (l) did not apply.  The district court detailed the stability of the child’s relationship with both parents and the stability of each parent’s home environment in its analysis of factor (d):

“At the time of trial, [Renton] had a stable home, a stable job, he had arranged for day care for the child if he were to be granted primary parenting responsibility.  [Renton] has extended family in the area that appear to be close and loving and willing to assist him in adjusting to having a child living with him if the court were to award him primary parenting responsibility.

“As of March, 2011, [Renton] continues to work for the Wells County Sheriff’s Department, but has applied to the Bismarck Police Department and hopes to be able to move to Bismarck in early summer, 2011.  He is dating a woman named Spring.  They are expecting a child together and they have purchased a home together, intending to live together.

“[The child] has not lived in [Renton’s] home, but has had overnight visitation since May of 2010.  [The child] . . . has adjusted well to spending time with [Renton]. 

“[The child] has been residing with [Vining] since she was born.  They lived in Bismarck until [Vining] and [the child] moved to Georgia when [the child] was 2 ½ years old.  After the Court ordered her to return to North Dakota, [Vining] and [the child] moved back to Jamestown and resided with [Vining’s] parents awaiting trial.

“At the time of the trial, [Vining] was planning to move to Georgia to be with her new husband living in a newly purchased house.  She planned to open a day care and stay home to be with [the child].  However, a few short weeks after the trial, [Vining’s] marriage to [Corcione] disintegrated.

“In November, [Vining] and [the child] moved from Jamestown to Bismarck, where [Vining] was employed at MedCenter One from November 2010 through February, 2011. . . .  She travels back to Jamestown to visit her parents frequently.

. . . .

“[Vining] provided a stable home for [the child] from the time of [the child’s] birth through January, 2010, but [] since that time, [the child’s] life has been substantially disrupted by moving to Georgia, getting to know [Corcione] as her stepfather, and then moving back to Jamestown, North Dakota and then to Bismarck, North Dakota.  [Vining] has not provided [the child] with a stable or secure home life since January, 2010.

“The Court believes that [Vining] was sincere in her desire to move to Georgia at the time of the trial, and the Court can understand that [Vining] may have found herself in ‘limbo’ after the trial and after [Corcione] filed for divorce, however, the Court expects candor from the parties at all times, but especially so when the residence of a young child is at stake, so that the Court can make a decision that is truly in the child’s best interest.

. . . .

“[Vining’s] life does not appear to be as stable at this point as [Renton’s] life.  Although [Vining] has provided a safe place for [the child] to live, and [the child] has been with [Vining] all of her life, [Renton’s] life is more stable at this time.  The Court finds this factor to favor [Renton].”

[¶20] “The important factor in weighing stability is the stability of the child’s relationship with the custodial parent.”  
Anderson v. Resler
, 2000 ND 183, ¶ 11, 618 N.W.2d 480.  The district court properly relied on Vining’s frequent moves and her short relationship with Corcione to support its finding that Vining had not provided the child with a stable life since January 2010.  
See
 
Kelly
, 2002 ND 37, ¶ 31, 640 N.W.2d 38.  The district court’s findings were sufficient to show the court weighed the child’s best interests against the stability of the child’s relationship with Vining.

[¶21] In addition to finding factor (d) favored Renton, the district court found two other best interests factors favored Renton and none of the best interests factors favored Vining.  First, the district court found factor (e), “[t]he willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child[,]” favored Renton.  The district court found Vining had been unwilling to allow Renton to have a relationship with the child prior to the initiation of court proceedings and Vining’s attitude had not changed during the proceedings.  The court supported its findings by noting specific instances of Vining’s conduct including her failure to inform Renton of the child’s baptism, her refusal to allow the child to meet Renton’s family visiting from Australia and her refusal to provide the name and address of the child’s daycare provider in her post-trial affidavits.  The district court also found factor (f), “[t]he moral fitness of the parents, as that fitness impacts the child[,]” favored Renton, explaining:

“[T]he Court is concerned that [Vining] has recently demonstrated an attitude that it is perfectly acceptable to provide false information or to stretch the truth, even in sworn affidavits and testimony before the Court in order to be seen in a perceived better light.  The Court is concerned that this attitude will be imputed to [the child], allowing [the child] to believe that telling little white lies to her father or to the court is OK, as long as it can help achieve the desired results.”

Following its findings, the district court stated that it “[found] this to be a very difficult decision” and determined that “[a]fter analyzing the above factors and much consideration the Court is going to award primary [residential] responsibility to [Renton], subject to generous parenting time awarded to [Vining].”

[¶22] Vining argues the district court erred by changing primary residential responsibility because the case was a “close call” as evidenced by the district court’s statement that the decision was “very difficult.”  Renton responds this case was not a “close call” and the district court’s findings show changing primary residential responsibility was necessary to further the child’s best interests.

[¶23] “[T]here is an aversion to changing the custody of a happy child who has been living with one parent for a substantial time.”  
Anderson
, 2000 ND 183, ¶ 9, 618 N.W.2d 480.  “However, notwithstanding a happy normal child with strong bonds of attachment to the custodial parent, egregious violations of specific court ordered visitation, evidence of an intransigent attitude against visitation rights and alienating behavior can weigh against the child’s best interests.”  
Id.
 at ¶ 11.  “We have often stated that ‘close calls’ in disputes over changing primary residential responsibility should be resolved in favor of continuing primary residential responsibility.”  
Glass v. Glass
, 2011 ND 145, ¶ 19, 800 N.W.2d 691.  “Nevertheless, cases that are ‘close calls’ may result in a change of primary residential responsibility when other considerations are weightier than the custodial stability factor.”  
Id.

[¶24] The district court found three of the best interests factors favored Renton and no factors favored Vining.  Based on those findings, we are not convinced the district court’s statement that the decision was “very difficult” indicated the decision was a “close call.”  However, even assuming the case was close, the district court’s findings clearly show other factors outweighed the stability of the child’s relationship with Vining.  In this case, the importance of maintaining custodial stability was diminished due to Vining’s failure to provide the child with a stable home environment since January 2010.  In addition, other factors favored a change of primary residential responsibility, including Vining’s persistent frustration of Renton’s parenting time and the concern that Vining’s untruthfulness could negatively impact the child.  We conclude the district court weighed the best interests factors as required in a modification of primary residential responsibility proceeding.  The district court’s finding that modification was necessary to serve the best interest of the child was not clearly erroneous.

III

[¶25] Vining argues that because the district court’s decision was based primarily on Vining’s frustration of Renton’s parenting time, the district court erred by changing primary residential responsibility before attempting other remedies.  Renton responds the district court did not modify primary residential responsibility primarily based on frustration of parenting time.  Renton argues the district court also relied on Vining’s inability to provide the child with a stable and secure home since January 2010, Vining’s refusal to provide Renton with information regarding the child and Vining’s inability to provide the child with proper parental guidance as evidenced by Vining’s providing false information to the district court.

[¶26] When a motion to modify primary residential responsibility is predicated on the custodial parent’s frustration of the noncustodial parent’s parenting time, the district court must act with the “restraint and caution” required to balance the competing rights, privileges and interests of the parents and the child.  
Sweeney v. Sweeney
, 2002 ND 206, ¶ 11, 654 N.W.2d 407.  We have stated a district court should try other remedies before ordering a change of primary residential responsibility to remedy a custodial parent’s frustration of a noncustodial parent’s parenting time.  
Frieze v. Frieze
, 2005 ND 53, ¶ 4, 692 N.W.2d 912; 
Sweeney
, at  ¶ 11; 
Anderson
, 2000 ND 183, ¶ 10, 618 N.W.2d 480; 
Hendrickson v. Hendrickson
, 1999 ND 37, ¶ 13, 590 N.W.2d 220; 
Loll v. Loll
, 1997 ND 51, ¶ 16, 561 N.W.2d 625; 
Van Dyke v. Van Dyke
, 538 N.W.2d 197, 201 (N.D. 1995); 
Blotske v. Leidholm
, 487 N.W.2d 607, 610 (N.D. 1992).  We also have stated that by enacting N.D.C.C. § 14-09-06.6(5), the legislature expressly recognized that frustration of parenting time may require a change of custody.  
Frieze
, at ¶ 4; 
Anderson
, at ¶ 10; 
Hendrickson v. Hendrickson
, 2000 ND 1, ¶ 18, 603 N.W.2d 896.

[¶27] Under N.D.C.C. § 14-09-06.6(5), persistent frustration of parenting time and endangerment of a child’s physical or emotional health are in the same behavioral class and may necessitate the same remedy of modification of primary residential responsibility.  
Frieze
, 2005 ND 53, ¶ 4, 692 N.W.2d 912; 
Hendrickson
, 2000 ND 1, ¶ 18, 603 N.W.2d 896.  Although a change of primary residential responsibility is legally permissible without resorting to other remedies, that result should be a rare event rather than the first choice.  
Frieze
, at ¶ 4; 
Tank v. Tank
, 2004 ND 15, ¶ 17, 673 N.W.2d 622 (overruled on other grounds by 
Lagro v. Lagro
, 2005 ND 151, ¶ 14, 703 N.W.2d 322 (overruled by 
Green v. Green
, 2009 ND 162, ¶ 5, 772 N.W.2d 612)).

[¶28] Renton’s argument that the district court’s decision was based on factors other than frustration of parenting time is persuasive.  In addition, we are not convinced the district court failed to try other remedies before ordering a change of primary residential responsibility.  Near the beginning of these proceedings, the district court held Vining in contempt and ordered Vining to agree to a parenting schedule permitting Renton substantial parenting time, including overnights.  Approximately one week later, Renton informed the district court Vining refused to allow him overnight parenting time and submitted a proposed parenting schedule.  The district court issued an interim order adopting Renton’s proposed schedule.  When the interim order expired, Renton attempted to continue his parenting time by extending the schedule in the interim order.  Vining refused to allow Renton to exercise the amount of parenting time he was granted in the interim order until the district court issued an order for continued interim parenting time.  Vining’s refusal to allow Renton overnight visitation after being ordered to so by the district court and her refusal to continue Renton’s parenting time after the order for interim parenting time expired demonstrated that, even after being held in contempt, Vining was not willing to facilitate a relationship between Renton and the child.  Under these circumstances, we are reluctant to conclude the district court did not attempt other remedies before ordering a change of primary residential responsibility.  However, even assuming modification of primary residential responsibility was the first remedy attempted, this case, where Vining frustrated Renton’s parenting time from when the child was born and then moved the child to Georgia without informing Renton, is one of the rare cases in which the district court was permitted to change primary residential responsibility before trying other remedies.  We conclude the district court did not err by changing primary residential responsibility from Vining to Renton.

IV

[¶29] We affirm the district court amended judgment modifying primary residential responsibility.

[¶30] Daniel J. Crothers

Dale V. Sandstrom

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.

Maring, Justice, concurring.

[¶31] I respectfully concur in the result.  I do so because I firmly believe that the enactment of N.D.C.C. § 14-09-06.6(6) did not change our analysis of motions for change of primary residential responsibility.  In my concurrence in the result in 
Kelly v. Kelly
, 2002 ND 37, ¶ 52, 640 N.W.2d 38,  I said:

In summary, in my opinion, the proper method for analyzing a motion to change custody is, first, the moving party must submit affidavits and briefs in support of the motion. N.D.C.C. § 14-09-06.6(4). Based on these briefs and affidavits, the trial court must determine if the party has established a “prima facie case justifying a modification.”  
Id.
  If the motion is brought in the two-year period following the entry of a custody order, a “prima facie case justifying a modification” is established by showing any of the three items listed under N.D.C.C. § 14-09-06.6(5). If the motion is brought after this two-year period, a “prima facie case justifying a modification” is established if the court finds a material change has occurred in the circumstances of the child or the parties.  
See
 N.D.C.C. § 14-09-06.6(4), (6)(a).  A material change in circumstances is a significant or important change that has a negative impact on the well-being of the child.  
See
 
Alvarez [v. Carlson]
, 524 N.W.2d [584, 589 (N.D. 1994)]; 
Blotske [v. Leidholm]
, 487 N.W.2d [607, 609 (N.D. 1992)]. Only when a party meets the standards for a “prima facie case justifying a modification” is the court required to hold an evidentiary hearing to determine if “modification is necessary to serve the best interest of the child.”  
See
 N.D.C.C. § 14-09-06.6(4), (6)(b).  At that point, the best interest factors must be gauged against the preference for the stability of the custodial parent-child relationship. Such a construction of N.D.C.C. § 14-09-06.6 gives meaning to every word of the statute and furthers the Legislature's intent of curtailing changes in custody and providing stability to children.

To the extent that the majority indicates the analysis is otherwise, I disagree.  Further, the trial court can easily misconstrue the meaning of stability within the context of a motion to change primary residential responsibility.  When the court weighs the best interest factors against the stability of the relationship between the child and the custodial parent, “stability” means more than the physical structure or the geographic location of the parent and child.  It means the psychological and emotional relationship the child has with the custodial parent.  A parent who has been the primary caretaker of the child is the one who has nurtured and loved the child and taken care of the child’s needs on a day-to-day basis.  I do not see this analysis in the trial court decision or the majority opinion.  Finally, our Court has said that “[a] child is presumed to be better off with the custodial parent, and close calls should be resolved in favor of continuing custody.  A change should only be made when the reasons for transferring custody substantially outweigh the child’s stability with the custodial parent.”  
Myers v. Myers
, 1999 ND 194, ¶ 10, 601 N.W.2d 264 (citing 
Barstad v. Barstad
, 499 N.W.2d 584, 587 (N.D. 1993) (citation omitted)).

[¶32] These principles must never be overlooked in the analysis of a motion to modify primary residential responsibility.  For this reason, I respectfully concur in the result.

[¶33] Mary Muehlen Maring